IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| **RICHARD MOUNT and ELLEN FROSCH,** | ) Civ. No. 14-00100 ACK-RLP |
| **Plaintiffs,** | ) |
| v. | ) |
| **KEAHOLE POINT FISH, LLC; BLUE OCEAN MARICULTURE, LLC; FISH FACTS, INC.,** *in personum*; **M/V KONA KAMPACHI I; and M/V/ KONA KAMPACHI II, their Engines, Tackle, Apparel, Furniture and Appurtenances, etc.,** *in rem*, | ) ) ) ) ) ) ) |
| **Defendants.** | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

For the following reasons, the Court hereby GRANTS Defendants' Motion for Summary Judgment. (Doc. No. 50.) Because the Court concludes that the United States Coast Guard Commercial Diving Operations regulations do not apply to Defendants' Kampachi Vessels, the Court grants judgment in Defendants' favor as to Plaintiffs' claims for negligence per se and unseaworthiness per se. All other claims in the Second Amended Complaint remain.

**FACTUAL BACKGROUND**[1/]

---

[1/] The facts as recited in this Order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings.

This is an admiralty case arising out of injuries Plaintiff Richard Mount suffered while working as a crew member and lead diver for Defendant Keahole Point Fish, LLC ("Keahole Fish"). (Def. CSF, Madsen Decl. ¶ 19; SAC ¶ 8.)

Defendant Blue Ocean Mariculture, LLC ("Blue Ocean") is an aquaculture company that raises Hawaiian Kampachi fish in submersed net structures approximately one mile off the coast of Kona, Hawaii. (Madsen Decl. ¶ 4.) In support of its business, Blue Ocean operates the following vessels: the Kona Kampachi I ("Kampachi I"), Official Number 1183797, and the Kona Kampachi II ("Kampachi II"), Official Number 1198834 (together, "Kampachi Vessels"). (Id. ¶ 3.)

Defendant Keahole Fish employs divers and other employees to support Blue Ocean's operations. (Id. ¶ 5.) Plaintiff began working for Keahole Fish in January of 2010.[2] (Id. ¶ 19.) Plaintiff Mount asserts that he suffered an ear injury on November 15, 2011, while working aboard the Kampachi I and taking part in a diving operation staged from that vessel. (SAC ¶ 14.) Specifically, a scuba regulator hose burst near his left ear during the dive, causing his alleged injury. (Id.; Def. CSF, Madsen Decl. ¶ 20; Def. CSF, Ex. H ("Report of Work-Related Injury").)

---

[2] Plaintiff also worked for Keahole Fish's predecessor company, Kona Blue, beginning in 2007. Keahole Fish hired him after purchasing Kona Blue. (Madsen Decl. ¶ 19.)

Plaintiff also claims that on September 6, 2012, he suffered an inguinal hernia while working underwater from the Kampachi II, pushing a net "sweep wall" used by the divers to confine fish to prepare them to be harvested. (SAC ¶¶ 16-23.) Plaintiff asserts that he and a group of other divers were pushing the sweep wall net, but at some point all of the other divers had surfaced without Plaintiff's knowledge. (Id. ¶¶ 18-21.) Plaintiff continued pushing against the sweep wall net and felt a sharp pain in his groin. (Id. ¶ 22.) Plaintiff continued working until he reported the incident on January 7, 2013. (Madsen Decl. ¶ 21; Def. CSF, Ex. I ("Report of Work-Related Injury").) Plaintiff was diagnosed with an inguinal hernia for which he underwent surgery at Kaiser Permanente in Kona on January 31, 2013. He continued to experience pain thereafter and, on January 29, 2015, underwent a second surgery at the UCLA Lichetenstein Amid Hernia Clinic. (Mot. at 4.) Plaintiff asserts that he continues to suffer the negative impacts of the injuries he suffered while working for Defendants. (SAC ¶¶ 51-52.)

**PROCEDURAL BACKGROUND**

On February 28, 2014, Plaintiffs Richard Mount and his wife Ellen Frosch (together, "Plaintiffs") filed their original Complaint against Blue Ocean, *in personum*, and the M/V KONA KAMPACHI I and M/V KONA KAMPACHI II, *in rem*. (Doc. No. 1.) Plaintiffs subsequently filed a First Amended Complaint on May 2,

2014, adding as defendants Keahole Fish, and Fish Facts, Inc. (all defendants collectively referred to as "Defendants"). (Doc. No. 15.) In the First Amended Complaint, Plaintiffs brought the following claims: (1) Jones Act Negligence as against all *in personum* defendants; (2) Unseaworthiness as against Defendants Blue Ocean, Fish Facts, and the Vessels; (3) Maintenance and Cure as against Defendants Keahole Fish Point and the Vessels; and (4) Loss of Consortium as against Defendants Blue Ocean, Fish Facts, and the Vessels. On August 5, 2014, the parties stipulated to the dismissal of Count III, Plaintiffs' maintenance and cure claim. (Doc. No. 29.)

On February 6, 2015, the parties stipulated to stay the instant case for approximately three months to allow Plaintiff Mount time to recover from a surgery he underwent on January 29, 2015.[3] (Doc. No. 38.) The stay was lifted on June 26, 2015, and Defendants filed the instant Motion for Summary Judgment, along with a concise statement of facts and numerous supporting exhibits, on July 22, 2015. (Doc. Nos. 50 & 51.)

While the instant Motion was pending, Plaintiffs were granted leave to file a Second Amended Complaint, re-alleging a claim for Maintenance and Cure. (Doc. No. 78.) Plaintiffs therefore filed their Second Amended Complaint on September 22,

---

[3] Pending at the time was a prior Motion for Summary Judgment filed by Defendants, (doc. no. 35); however, that motion was withdrawn when the parties stipulated to the stay.

2015, alleging the same four counts as alleged in the First Amended Complaint (including the Maintenance and Cure claim that had previously been dismissed via the parties' stipulation). (Doc. No. 80.)

Plaintiffs filed their memorandum in opposition to the instant Motion, along with a concise statement of facts and several exhibits, on October 9, 2015.[4] (Doc. Nos. 88 & 89.) Defendants filed their reply on October 19, 2015. (Doc. No. 93.)

A hearing on the Motion[5] was held on November 2, 2015.[6]

## STANDARD

Summary judgment is appropriate when a "movant shows

---

[4] In their concise statement of facts, Plaintiffs object to the Expert Report of Defendants' expert, Mr. Sharpe, "to the extent Mr. Sharpe offers legal conclusions[.]" (Pl. CSF ¶¶ 5-6, 10-11.) Because it is arguable that Mr. Sharpe's expert opinion reaches the ultimate issues and offers legal conclusions, in an abundance of caution the Court will not consider it in ruling on the instant Motion. See Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1065 n.10 (9th Cir. 2002)("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law."), *overruled on other grounds by* Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457 (9th Cir.) cert. denied, 135 S. Ct. 55, 190 L. Ed. 2d 30 (2014).

[5] Also pending before the Court are Defendants' Motion to Dismiss, filed on September 22, 2015, (doc. no. 81,) and Motion for Summary Judgment, (doc. no. 85,) both of which are set for a hearing on December 17, 2015.

[6] At the conclusion of the hearing, the Court instructed the parties to file supplemental briefs addressing several additional issues brought up during the hearing. The parties timely filed their briefs on November 19, 2015. (Doc. Nos. 105 & 106.)

5

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. Id. at 587.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . . or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 585. "[T]he requirement is that there be

6

no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247–48 (emphasis in original). Also, "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Likewise, the nonmoving party "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).

## **DISCUSSION**

In the instant Motion, Defendants seek summary judgment as to the applicability of the United States Coast Guard ("USCG") diving regulations and, thus, the viability of Plaintiffs' claims for negligence per se and unseaworthiness per se based upon alleged violations of those regulations, as set forth in Kernan v. American Dredging Co., 355 U.S. 426 (1958).[7]

In Kernan, the United States Supreme Court held that the strict liability principles set forth in the Federal Employer's Liability Act ("FELA"), 45 U.S.C. §§ 51-60, apply in

---

[7] As Plaintiffs note in their opposition, they appear to have also raised negligence and unseaworthiness claims not based upon a per se theory; however, those claims are not at issue in the instant motion.

Jones Act cases,[8] and, as such, a violation of a statute or Coast Guard regulation that causes the injury or death of any employee creates liability "in the absence of any showing of negligence." 355 U.S. 426, 431 (1958). Thus, under the Jones Act, "the common-law concepts of foreseeability and risk of harm are not applicable where the employer violates a federal statute or a Coast Guard regulation, if such conduct in whole or in part caused injury." MacDonald v. Kahikolu Ltd., 442 F.3d 1199, 1203 (9th Cir. 2006).

Here, Plaintiffs assert that Defendants were subject to and violated the Coast Guard's Commercial Diving Operations regulations (codified at 46 C.F.R. § 197.200 *et seq.*) and are therefore subject to per se liability for Plaintiffs' alleged harm. Defendants counter that the Kampachi Vessels are uninspected fishing vessels not subject to the Coast Guard regulations and, thus, they cannot be held per se liable based upon those regulations. The Court therefore turns to an examination of the applicability of the Coast Guard regulations to the Kampachi Vessels.

The Coast Guard Commercial Diving Operations regulations apply on their face to any "commercial diving operations taking place" from, *inter alia*, "vessels required to

---

[8] The parties do not appear to dispute that Plaintiff Mount was a seaman injured during the course of his employment as such for purposes of Jones Act liability. (See generally Mot.; Opp'n.)

have a certificate of inspection issued by the Coast Guard." 46 C.F.R. § 197.202. Defendants assert that the Kampachi Vessels are fishing vessels and fish tender vessels below a certain size and weight and, as such, are not subject to inspection under 46 U.S.C. § 3301 because of applicable exemptions under 46 U.S.C. § 3302. (See generally Mot.) Plaintiffs do not appear to dispute that the Kampachi Vessels are fishing and fish tender vessels, or that those types of vessels are exempt from inspection; however, Plaintiffs assert that the Kampachi Vessels may nevertheless also be classified as towing vessels under 46 U.S.C. § 3301, such that they are, in fact, subject to Coast Guard inspection.[9] (Opp'n at 7-9.) The instant dispute therefore turns on whether the Kampachi Vessels may be classified as towing vessels for purposes of the USCG regulations.

A "towing vessel" is defined by the Coast Guard Regulations as "a commercial vessel engaged in or intending to engage in the service of pulling, pushing, or hauling along side, or any combination of pulling, pushing, or hauling along side." 46 U.S.C. § 2101(40). Noting that this definition's use of the phrase "in the service of" may not be interpreted as mere surplusage, a Vice Commandant of the Coast Guard, in examining this language for purposes of an administrative proceeding,

---

[9] Contrary to Plaintiffs' assertions, Defendants do not argue that vessels cannot fall under more than one classification in 46 U.S.C. § 3301. (Reply at 2.)

9

concluded that the definition encompasses all "commercial vessels in the business of towing." U.S. Coast Guard v. License No. 659384 and Merchant Mariner's Doc. No. XXX-XX-XXXX-D1 Issued to: Michael L. Williams, Appellant, Appeal Decision 2566, 1995 WL 17010116, at *5 (USCG May 2, 1995), aff'd, NTSB Order No. EM-181, 1996 WL 30281 (Jan. 4, 1996) (finding that a vessel "returning to Seattle from a towing job in Cherry Point, crewed appropriately for towing, and operated by a towing company" was "in the service of towing" and thus a towing vessel for purposes of USCG regulations).

Here, it does not appear that the Kampachi Vessels are engaged in the business, or "service of pulling, pushing, or hauling along side," as required by the statute. See id. Rather, it appears the Kampachi Vessels are engaged in the business of commercial fish farming. First, the physical characteristics of the vessels and their customary use support this conclusion. The vessels are outfitted for fishing, rather than towing operations. The Kampachi Vessels are former U.S. Navy or Army Landing Craft Mechanized 8 vessels refitted for fish farm tending. (Madsen Decl. ¶ 8; Pl. CSF ¶ 1.) Thus, they are equipped with fish harvesting pumps, cranes, bins to hold fish, scuba gear, fish feeding pumps, fish peroxide treatment pumps, and air compressor and associated hoses to lift the fish pens to the surface. (Madsen Decl., Exs. A, B, E; Pl. CSF ¶ 8.) The vessels make use

of this equipment to (1) transport fish from hatcheries to offshore pens, or from existing pens to new ones; (2) carry fish feed and other products from the harbor to the fish pens; (3) clean and move fish pens; (4) feed, clean, and tend to the fish; and (5) harvest fish and transport the harvested fish to shore. (Madsen Decl. ¶¶ 6, 15 & Ex. C.) The vessels do not engage in commercial towing. (Madsen Decl. ¶ 14.) Thus, the equipment aboard the Kampachi Vessels, as well as their apparent customary use, indicate that they are not engaged in the business of towing.

      Moreover, the documentation issued by the USCG to the Kampachi Vessels also supports the conclusion that they are fishing, rather than towing, vessels. The Kampachi I's Certificate of Documentation,[10] issued by the USCG's National Vessel Documentation Center ("NVDC") states that the vessel's operational endorsements are fishery[11] and registry[12] only. (Def. CSF, Madsen Decl. ¶ 11 & Ex. F.) Similarly, the Kampachi II's

---

[10] The Certificate of Documentation is a document issued by the Coast Guard indicating the service in which the vessel is permitted to engage. There are five types of endorsements: registry, coastwise, Great Lakes, fishery, and recreational. The "coastwise" endorsement indicates that a vessel is permitted to engage in dredging and towing. 46 C.F.R. § 19(a).

[11] A "fisheries" endorsement entitles a vessel to employment in the fisheries. 46 C.F.R. § 67.21(a).

[12] A "registries" endorsement entitles a vessel to employment in foreign trade. 46 C.F.R. § 67.17(a).

Certification of Documentation states that it also has operational endorsements for fishery and registry only. (Madsen Decl. ¶ 12 & Ex. G.) It is undisputed that neither vessel has a coastwise endorsement, which would entitle them to be used in towing. See 46 C.F.R. § 67.19(a). Indeed, were the Kampachi Vessels to engage in towing without coastwise endorsements, Defendants would be subject to monetary fines and possible forfeiture of the vessels and their equipment. 46 U.S.C. § 12151; 46 C.F.R. § 67.142.

Defendants assert that the USCG, in a letter dated July 1, 2015,[13] confirmed, based upon Defendants' description of the vessels' operation and the information contained in the USCG's Marine Information Safety and Law Enforcement database,[14] that

---

[13] Plaintiffs have objected to the admissibility of the letter from the Coast Guard on the grounds that it contains inadmissible hearsay; however, it appears the letter is admissible as admissible hearsay under Federal Rule of Evidence 803(8) (public records). See Quiles v. Sikorsky Aircraft, 84 F. Supp. 2d 154, 162 (D. Mass. 1999) (finding that "the Coast Guard letter, here attached by plaintiff's expert, is admissible as a government document"); Mowery v. Mercury Marine, Div. of Bruswick Corp., 773 F. Supp. 1012, 1015 n.6 (N.D. Ohio 1991) (same); see also Lundquist v. Cont'l Cas. Co., 394 F. Supp. 2d 1230, 1243 (C.D. Cal. 2005) ("It is well established that a court may take judicial notice of records and reports of administrative bodies, such as notices and opinion letters issued [by them.]" (alteration omitted)).

[14] The Court notes that it is not entirely clear what specific information the Coast Guard was relying upon when it issued the July 1, 2015 letter; it appears to be in response to a letter from Blue Ocean, as well as a follow-up phone conversation with Mr. Madsen. (Def. CSF, Madsen Decl., Ex. M.) Because of the
(continued...)

the Kampachi Vessels are "fish tender vessels[15/] [and, a]s such, they are not subject to inspection by the U.S. Coast Guard at this time." (Def. CSF, Madsen Decl., Ex. M.) And it is undisputed that the Kampachi Vessels do not, in fact, have USCG Certificates of Inspection. (Def. CSF ¶ 4; Pl. CSF ¶ 4.) Thus, the USCG documentation for the Kampachi Vessels is also persuasive evidence that they are not towing vessels subject to USCG inspection.

      Plaintiffs nevertheless argue that, because the Kampachi Vessels have engaged in "substantial" towing activity, they are properly categorized as towing vessels for purposes of the Coast Guard regulations. (Opp'n at 12-13.) To support this argument, Plaintiffs note that the Kampachi Vessels are regularly used (1) to tow component parts of offshore fish cages between the offshore farm site and land, (2) to assist in "cage-flipping," wherein they tow offshore cages into position; and (3) to tow "transfer pens" used to move fish between offshore cages. (Id.) Importantly, however, all of these activities are merely incidental to the business of fish farming. See Gremillion v.

---

[14/](...continued)
lack of clarity as to the information regarding the vessels' operations provided to the Coast Guard, the Court places no weight on the aforementioned USCG letter.

[15/] As "fish tender vessels," the Kampachi Vessels are entitled to commercially supply, store, refrigerate, or transport fish and fish products from a fishing, fish processing, or fish tender vessel. 46 U.S.C. § 2101(11c).

Gulf Coast Catering Co., 904 F.2d 290, 293 (5th Cir. 1990) (stating that, in determining whether a craft qualifies as a "vessel" for purposes of the Jones Act, "it is necessary to focus upon the purpose for which the craft is constructed and the business in which it is engaged," and concluding that a work platform was not a vessel because its movement across navigable waters in the course of normal operations was "merely incidental to the platform's primary purpose" which was not transportation).

Plaintiffs also point to two incidents where the Kampachi Vessels were used in a towing capacity in the aid of others: (1) when they were used to aid in the retrieval of a burst pipe belonging to the Natural Energy Laboratory of Hawaii Authority ("NELHA"); and (2) when they aided a vessel disabled at sea by towing it back into Honokohau Harbor. (Opp'n at 13.) As was the case with the instances of equipment towing incidental to the fish farming operation, the Court believes that these instances of occasional Good Samaritan towing are simply insufficient to reclassify these commercial fishing vessels into towing vessels for purposes of the Coast Guard regulations.

Indeed, the Proposed Regulations promulgated by the Coast Guard establishing the rules governing inspection of towing vessels would expressly exclude from inspection "workboats that do not engage in commercial towing for hire, but may intermittently move a piece of equipment within a work site such

14

as a dredging or construction site; and towing vessels performing assistance towing." Inspecton of Towing Vessels, 76 Fed. Reg. 49976, 49979 (proposed Aug. 11, 2011). The Court notes, however, that this rule has yet to become final and, therefore, is of no force or effect; although, it does reflect that under the current USCG proposal the towing activities the Kampachi Vessels undertake, both incidental to the farming operations and when providing occasional assistance to other vessels, do not suggest that they are in the business of towing, or convert them into towing vessels subject to Coast Guard inspection.[16/]

Finally, the Court notes that the fact that the Kampachi Vessels are currently inspected and regulated by the Occupational Safety and Health Administration ("OSHA") also

---

[16/] Plaintiffs also assert that this case is similar to Habel v. Grove Farm Fish & Poi, LLC, in which this district court concluded that the vessel at issue did qualify as a towing vessel for purposes of the USCG Commercial Diving Operations regulations. 855 F. Supp. 2d 1112, (D. Haw. 2012). In Habel, the defendant, Grove Farm, was a fish farming operation located off the coast of Ewa Beach, Oahu. Id. at 1114. The vessel at issue in that case has a coastwise endorsement (although there is no evidence as to whether the endorsement was in place at the time of the suit), (Def.'s Supp., Ex. C,) and did, in fact, tow a fish feed barge approximately twice a week. Id. at 1123. Importantly, the defendants in Habel did not dispute that their vessel was a towing vessel under 46 U.S.C. § 3301. Rather, they argued that, because the Coast Guard had not yet promulgated regulations governing towing vessels (and, thus, were not actually inspecting towing vessels), they could not be considered subject to Coast Guard inspection for purposes of per se liability under the Jones Act. 855 F. Supp. 2d at 117-18, 1123-24. Thus, Habel is of limited use in determining whether the Kampachi Vessels here may be considered towing vessels under section 3301.

supports its conclusion that they are not subject to the Coast Guard diving regulations. The OSHA diving regulations do not apply to those diving operations over which the Coast Guard exercises inspection and regulating authority. See Chao v. Mallard Bay Drilling, Inc., 534 U.S. 235, 122 S. Ct. 738, 743 (2002) (noting that "OSHA's regulations have been pre-empted with respect to *inspected* vessels" (emphasis in original)); see also Memorandum of Understanding, U.S. Coast Guard and the Occupational Safety and Health Administration, 48 Fed. Reg. 11366 (March 17, 1983); OSHA Authority Over Vessels and Facilities on or Adjacent to U.S. Navigable Waters and the Outer Continental Shelf, Directive No. CPL 02-01-047 at 10 (Feb. 22, 2010) (stating that OSHA has jurisdiction over seamen on vessels *not* inspected by the Coast Guard); OSHA Instruction Re: Commercial Diving Operations, Directive No. CPL 02-00-151 at B-2 (June 13, 2011) ("Under a 1983 Memorandum of Understanding between OSHA and the U.S. Coast Guard, the occupational safety and health of seamen on inspected vessels is the exclusive responsibility of the U.S Coast Guard."). Thus, the OSHA diving regulations only apply to diving operations launched from vessels that are not inspected by the Coast Guard.[17]

---

[17] The Ninth Circuit has held that a violation of OSHA regulations, as opposed to Coast Guard regulations, does not give rise to per se liability under FELA and the Jones Act. See Robertson v. Burlington Northern R. Co., 32 F.3d 408, 410-11 (9th Cir. 1994) (holding that OSHA standards may be admitted in a FELA case as evidence of the applicable standard of care, but "a
(continued...)

Here, Plaintiffs do not dispute that the Kampachi Vessels are subject to and actually regulated under OSHA's diving regulations. (See Pl. CSF ¶¶ 16-18.) Indeed, in early 2013, OSHA conducted a surprise inspection of the Kampachi Vessels to ensure their compliance with the OSHA diving regulations. (Def. CSF ¶ 18; Pl. CSF ¶ 18.) Moreover, OSHA generally appears to exercise jurisdiction over fish farming operations like Defendants'. Thus, for example, OSHA has issued an Interpretation Letter stating that "[o]perations that are clearly part of the controlled growing and harvesting of fish . . . are covered by the OSHA standards for agriculture . . . [t]hus, diving operations directly related to activities involving the controlled growing and harvesting of fish, shellfish, and plants are considered agricultural operations." (Def. CSF, Ex. Q (OSHA, Standard Interpretation No. 1928 (Sept. 28, 1982).) It therefore appears that OSHA views commercial fish farming operations like the one

---

[17]/(...continued)
violation of an OSHA regulation is not negligence per se"); McCoy v. Foss Maritime Co., 442 F. Supp. 2d 1103, 1112 (W.D. Wash. 2006) (citing Robertson and holding, in the context of an admiralty case, that violation of OSHA regulations does not constitute negligence per se, but that the OSHA regulations "provide strong evidence of the standard of care"); see also 29 U.S.C. § 653(b)(4) ("Nothing in [the OSHA statutory scheme] shall be construed to ... enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers *801 ... with respect to injuries ... arising out of, or in the course of, employment.").

at issue here to be governed by the OSHA diving regulations.[18/]

In sum, in light of their physical characteristics, their customary use, their official documentation, and OSHA's exercise of jurisdiction over the diving operations launched from them, the Court concludes that the Kampachi Vessels are not "vessels required to have a certificate of inspection issued by the Coast Guard." 46 C.F.R. § 197.202. Because the Kampachi Vessels are not subject to inspection by the Coast Guard, the Coast Guard Commercial Diving Operations regulations do not apply to the diving operations taking place from them. Id. Plaintiffs therefore cannot base their negligence per se and unseaworthiness per se claims on any alleged violations of those Coast Guard regulations. The Court therefore GRANTS Defendants' Motion for

---

[18/] The Court notes, however, that it appears that OSHA maintains jurisdiction over diving operations from uninspected towing vessels at this time. As stated above, while 46 U.S.C. § 3301 includes towing vessels as subject to inspection, because the Coast Guard has not yet issued final regulations regarding the inspection of towing vessels, towing vessels (except those that are steam powered, tugboats, or seagoing towing vessels over 300 gross tons) are not actually inspected at this time. Thus, they are classified as uninspected towing vessels and therefore fall under OSHA's jurisdiction. See, e.g., OSHA AUTHORITY OVER VESSELS AND FACILITIES ON OR ADJACENT TO U.S. NAVIGABLE WATERS AND THE OUTER CONTINENTAL SHELF, Directive No. CPL 02-01-047 at 11 (Feb. 22, 2010). The fact that OSHA, rather than the Coast Guard, has actually exercised inspection authority over the Kampachi Vessels (and actually charged violations and issued fines) is therefore not, in and of itself, definitive evidence that they are solely uninspected fishing vessels, and not also uninspected towing vessels. However, as discussed above, in light of the physical characteristics, use, and documentation of the vessels, the Court is satisfied that they are, in fact, fishing vessels.

18

Summary Judgment as to Plaintiffs' negligence and unseaworthiness claims to the extent they are based upon a theory of per se liability.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment. (Doc. No. 50.) Because the Court concludes that the United States Coast Guard Commercial Diving Operations regulations do not apply to Defendants' Kampachi Vessels, the Court grants judgment in Defendants' favor as to Plaintiffs' claims for negligence per se and unseaworthiness per se. All other claims in the Second Amended Complaint remain.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 23, 2015



_____
Alan C. Kay
Sr. United States District Judge

Mount v. Blue Ocean Mariculture, LLC et al., Civ. No. 14-00100 ACK-RLP, Order Granting Defendants' Motion for Summary Judgment.